J. C. GRIFFIN, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed July 8, 1916.

1. Under an indictment for an assault with intent to commit murder, the defendant may be convicted of an assault with intent to commit manslaughter, and when the evidence adduced is sufficient to support such verdict, it is not reversible error for the trial court to refuse requested instructions based upon Section 3229 of the General Statutes of Florida, which relates to punishment for culpable negligence.

2. In order to warrant the conviction of a defendant under an indictment, charging him with assault with intent to commit murder, of any of the grades or degrees of unlawful homicide, the evidence must establish the intent of the defendant to commit the crime, but where such intent is established by the evidence adduced the conviction will be affirmed.

Writ of Error to Circuit Court, Jackson County; C. L. Wilson, Judge.

Judgment affirmed.

*W. E. Bryan Smith,* for Plaintiff in Error;

*T. F. West, Attorney General,* and *C. O. Andrews, Assistant,* for the State.

SHACKLEFORD, J.—J. C. Griffin was indicted for the crime of assault with intent to commit murder, filed a plea of not guilty, was tried before a jury, was convicted of an assault with intent to commit manslaughter and was sentenced to confinement in the State Prison at hard labor for a period of five years.

The first assignment is as follows: "The court erred in refusing to give Special Charge Number 1½ requested by defendant, to-wit: 'Under the law of this State whoever through culpable negligence or a reckless disregard for the safety of others, inflicts any personal injury or injuries upon another not resulting in death is guilty of assault through culpable negligence.' "

The second assignment, which is argued together with the first, is as follows: "The court erred in refusing to give Special Charge Number 2,—to-wit: 'One of the lesser offenses covered by this indictment is assault through culpable negligence, the definition of which I have just charged you, and if you believe from the evidence that a personal injury was inflicted upon Fred Horne not resulting in death, by an assault committed by the defendant, but such personal injury was inflicted by the defendant through culpable negligence, or a reckless disregard for the safety of the said Fred Horne, or others, you should find him guilty of assault through culpable negligence.' "

The indictment was unquestionably based upon Section 3230 of the General Statutes of 1906, Compiled Laws of 1914, which reads as follows: "Whoever commits an assault on another, with intent to commit any felony punishable with death or imprisonment for life, shall be punished by imprisonment in the State prison not exceeding twenty years. An assault with intent to commit any other felony shall be punished to an extent not exceeding one-half the punishment which could have been inflicted had the crime been committed."

The requested instructions were evidently predicated upon Section 3229 of the General Statutes of 1906, Compiled Laws of 1914, which originally formed Chapter 5212 of the Laws of Florida, (Acts of 1903, page 192) and is as follows: "Whoever through culpable negligence, or a reckless disregard for the safety of others, inflicts any personal injury or injuries upon another, not resulting in death, shall be punished by imprisonment in the county jail not exceeding one year or by fine not exceeding one thousand dollars, or by both such fine and imprisonment."

It will be observed that the crime set forth in Section 3230 is a felony, while the crime denounced in Section 3229 is a misdemeanor. Undoubtedly the crime of an assault with intent to commit manslaughter is included within an indictment for the crime of an assault with intent to commit murder, with which crime the defendant was charged. We have several times expressly so held. See Williams v. State, 41 Fla. 295, 26 South. Rep. 184, and Bryan v. State, 45 Fla. 8, 34 South. Rep. 243. We would also refer to Taylor v. State, 49 Fla. 69, 38 South. Rep. 380, and Feagle v State, 55 Fla. 13, 46 South. Rep. 182. We have also held that "A man indicted for assault with intent to commit murder may, under such charge, be

convicted of an aggravated assault." Pittman v. State, 25 Fla. 648, 6 South. Rep. 437. Also see Winburn v. State, 28 Fla. 339, 9 South, Rep. 694, and Freeman v. State, 50 Fla. 38, 39 South. Rep. 785. It may be true that the jury, under the indictment in the instant case, could have convicted the defendant of the crime set forth in Section 3229, which we have copied above, provided the evidence adduced so warranted. Even so, if the evidence was sufficient to support a verdict for the crime of an assault with intent to commit manslaughter, as found in the instant case, the refusal of the requested instructions would not constitute reversible error.

Very briefly stated, the evidence establishes that Fred Horne was driving a Ford car, belonging to Mr. Holmes Elmore in which Mr. Elmore was riding, on the night of the 14th of October from Sneads to Blountstown, when Fred Horne was struck by a ball fired from a pistol and seriously wounded, which pistol was discharged by the defendant, J. C. Griffin. At the time that he was struck by the ball Horne did not know who had fired the shot, and also testified as follows: "I had not had any difficulty with the defendant at all. At the time I was shot I was not trying to do anything to him at all; I didn't see him; there was no reason that I know of for him to shoot me. This happened in Jackson County, Florida, about October 14th last."

Cleve Lockey, a State witness, testified that on the night when the shooting took place he was walking with the defendant and before they got in the road an automobile passed and then proceeded to testify as follows: "and we went on and heard another one coming up the hill, and he said he believed he would shoot, and I said, 'No, don't shoot,' and when it got close he got up on the bank and got between two little saplings and I passed on

by him a little piece and I stopped between a sapling and a haw bush, and just as the automobile got even I saw him feeling in his clothes, and I touched him on the arm and said 'J. C. don't do that,' and just as it passed he got down in the road and shot. I was on the bank when he shot and I stepped down in the road and he made a remark: I said 'Boy suppose you broke the one's neck that is running it, you would have killed every one in there.' I said 'I thought you shot straight up,' and he said 'I shot right in behind the damned thing,' and then we went on and I stopped at home and he went on to his house. The next day I saw you (Mr. Buford) and Mr. Tom Belser and Tom McKeown down there and showed you all where the shooting occurred. I did not have hold of Griffin, not when he shot; I was not in reach of him when he shot."

On cross-examination, the witness testified: "We hadn't stopped only when we heard the car coming he stopped. I don't know exactly how far we were from the car when the pistol fired, about as far as from here to the further corner of the room. Q. When he pulled out that pistol and said, 'I believe I am going to shoot' didn't you grab at his arm and say, 'Don't shoot?' A. He didn't say he would shoot then, he said that when he saw the car coming. When he pulled out his pistol I didn't grab his arm or grab the pistol and say 'Don't shoot,' I just touched his arm and said 'Don't shoot.' I touched his arm along here (indicating between elbow and wrist) I touched his right arm; he had his gun in his right hand; I didn't see him aim the gun right down the road like this (indicating on a level) I do not know as a matter of fact whether that the pistol hit something else before it hit the automobile or not; there were some trees there but they were not in the road; we were standing on the side of the

road among two saplings; that was not all the saplings there was on the road; there were some big oaks along side of the road; there was no house right there, just regular open pine woods. I don't know as a matter of fact what direction that pistol was aimed when it actually fired. I couldn't tell whether the pistol struck an oak or some obstruction and glanced and hit that automobile or not; I had no idea it hit anybody; I didn't know whether he hit anybody or not until the next morning and he didn't act like he hit anybody."

The examination of the witness then proceeded as follows:

"*Mr. Buford*: I was up on the bank and he was down in the road. It is a graded road about 25 or 30 feet wide. There wasn't anything in the road that was in sight except that automobile except the trees hanging over the edge of the road. All I know about where he shot is that he told me that he shot right in behind the damn thing.

"*By the Court*: I said I touched his right arm and I said, 'J. C. don't do that,' and he got down in the road, when he shot I was not touching his arm at the time he shot.

### RE-CROSS EXAMINATION.

"*Mr. Smith*: When that pistol fired he stepped right down, (off of embankment) and shot and looked like he was in the rut of the graded road; looked like about the middle of the road, the buggy goes in about the middle of the road, the road is about 30 feet wide and the embankment about a foot and a half high; when I grabbed at his arm wasn't when the pistol fired; I didn't grab him when he was fumbling with his clothes. I said, 'J. C. don't shoot,' and then he stepped down and the pistol fired."

Holmes Elmore a State witness, testified as follows: "My name is Holmes Elmore. I was with Fred Horne the night he got shot. It was my car we were driving; the top was down, and it (the shot) went through the top bow of the top about an inch and it was on the left side, same side Horne was driving on; the next place it struck after passing through was Horne; did not strike either one of the seats; went in his left side between the shoulders. Q. State about what was the difference in the height from the ground in your best judgment, of that bow and the place where it hit Horne in the back, here is what I want to get at,—I want to know, say that the bow was a certain height from the ground, what was the difference in the height from the ground to the place where that ball hit the bow and the height from the ground where it hit Horne in the back? A. Just about the same distance,—looked like it just did miss the back seat and the front seat,—right on a line.

"It was about three feet or something like that, two and one-half feet from the bow to the place where it hit Horne; no I don't know exactly the distance between the back seat and the back of the back seat and the back of the front seat. It was a Ford car; when the top lets down the bows go down back of the back seat, the bows come down I reckon about five feet from where Fred was shot, judging from the way the ball hit the bow and the way it hit him, it was traveling on a level.

CROSS-EXAMINATION.

"*Mr. Smith*: I don't know whether or not the place into which the bullet entered this bow was something like two inches higher from the ground than the wound in Horne's back was from the ground; looked to be on a

level according to the range of the bullet; I didn't measure it to see but it looked to be on a level; I could swear it was level; somewhere about in an inch or two would be somewhere about in a level; I made no measurements to ascertain that fact.

### RE-DIRECT.

"The place where he was shot was a little bit down grade; the first hill we went up was up hill and the next was a long slant hill; and we were going down that when we were shot.

"*By the Court*: I could tell whether the bullet went straight through or not; it went straight through.

### RE-CROSS.

"I don't know whether that bullet struck something else before it hit this bow or not; it didn't strike nothing else. Q. You saw it all the time from the time it left the pistol? A. There wasn't anything else in the way; just as soon as we passed I looked back,—I had my arm around the back of the seat and had on a pair of button shoes and they hurt my feet, and I started to unbutton them and as I started to stoop down the pistol fired. The car was about twenty feet from the parties when the pistol fired; it wasn't about as far as the corner of this building; I thought it was a tire bursted at first; we were going about eighteen miles an hour."

The defendant testified in his own behalf as follows: "My name is J. C. Griffin; I went down to Shady Grove with Lockey to get some shells; we were going hunting Friday night; we went down to the pond to a picnic, and went from there to Shady Grove; I never would plead

guilty to what they had me charged with—we were going along and heard a car coming up the road and something was said about what kind of a car it was and I think I said it was a Ford, and we stopped just on the outside of the road to let it pass, and we were standing there and I said, 'I believe I'll shoot,' and went to shoot right straight up and stepped down in the road and just as I stepped down into the road, and just as I stepped down in the ditch Cleve Lockey jerked my arm, and I had the pistol cocked and just as I went to shoot right straight up he throwed his hand on my arm and jerked it down and it fired; my intention wasn't to shoot anybody, didn't have nothing against the boy or nothing like that, and didn't even know the folks, and we went on and nothing was said about it, and the next morning McDaniel come and told me about it, said a fellow was shot and supposed he was dead by that time, and asked me did I know anything about who shot him, and I told him no,—I didn't know at that time he got shot, and we went around and found Lockey and Lockey told him how it was, and I didn't tell him how it was because they all told me they were going to break my neck; I never had been arrested before and I was scared, and they brought me on up here and put me in jail, and Mr. Gilbert and Mr. Bowles come to the jail and tried to make me plead guilty, and I wouldn't plead guilty because I didn't know what they were going to do with me; I never had been up before; I knowed I hadn't shot the boy intentionally, didn't intend to shoot the pistol down the road the way the automobile was going; I had the pistol right straight up and cocked and stepped down something like this, (illustrating) and he jerked my arm down and it fired when he jerked it down. Neither of us knew anything about anybody being hit at that time; I said 'They are running, aint they?' or something like

that; at that time I had no idea anybody was hit; I had no intention of shooting anybody. No, sir, there were no houses around there where we were; there were woods there, and trees; the automobile, at the time the pistol fired, was something like seventy-five or eighty steps I suppose from us; no, sir, I did not know this boy that was shot; I am not personally acquainted with him; I had no hard feeling against him; none whatever; no malice towards him.

### CROSS-EXAMINATION.

"*R. H. Buford*: I just shot right straight up just to be shooting, I suppose; no bad intention at all, just to be shooting; I don't know why I shot when people were passing in an automobile. I just thought I would shoot straight up; no, sir, I didn't think I would scare them; I did not intend to scare them or hurt them; as to the distance to embankment where we were standing when I shot the pistol, I was just stepping down like that (illustrating); I had the pistol in my right hand right straight up; the road does not make a curve where we were· it doesn't make any curve, it is straight; we were ..ot at the bottom, no sir, there is no curve there; the hill does not make a curve from the bottom to the top so that you cannot see the top; the shooting was done below Lockey's nearly a quarter; you can't see the house from there because there is a strip of woods there; we were on a slant there, no sir, the reason you can't see the house is not because the road makes a curve, it is a perfectly straight road, just like this was ·the ditch, this is the road, here, and here comes a wagon rut (indicating), I was standing right here on this embankment; just as I stepped down I held the pistol in this position and he was standing over here on my side and

jerked my arm down and the pistol was cocked and fired off. I was facing straight across the road. Q. And you shot across the road? A. I had my hand straight up and he jerked it down and the pistol fired. I was on the right side of the road going to Sneads and of the left hand side going to Shady Grove; yes, sir, I guess it would be on the south side; the automobile was in the middle of the road; when I shot the pistol the automobile was something like seventy-five steps away; I was just shooting at random.

*"By the Court*: Mr. Lockey got hold of my right arm, I had my pistol in right hand and he jerked my arm down as the pistol went off; he, Lockey, was on the right side of me.

### RE-DIRECT EXAMINATION.

"I had no intention whatever of shooting the pistol down the road in the direction they went; if Lockey had not struck my arm and knocked it down that pistol would not have fired down the road towards the automobile at all; I had it right straight up."

We have given all the material testimony which bears upon the shooting of the pistol.

As we have held, in order to warrant the conviction of a defendant under an indictment, charging him with assault with intent to commit murder, of any of the grades or degrees of unlawful homicide, the evidence must establish the intent of the defendant to commit the crime. See Williams v. State, 41 Fla. 295, 26 South. Rep. 184; Knight v. State, 42 Fla. 546, 28 South. Rep. 759; Johnson v. State, 53 Fla. 45, 43 South. Rep. 779. We are of the opinion that the intent of the defendant to commit the offense for which he was convicted is established by the evidence. See Peterson v. State, 41 Fla. 285, 26 South. Rep. 709, and Jones v. State, 66 Fla. 79, 62 South. Rep.

899.   It seems to us that no error has been made to appear in the refusal of these requested instructions, therefore we must hold that these two assignments have not been sustained.

While we have examined the other errors assigned, we are of the opinion that the two assignments just discussed are the only ones which merit treatment.

The judgment will be affirmed.

TAYLOR, C. J., and COCKRELL, WHITFIELD and ELLIS, JJ., concur.